IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 6, 2024

## CORDELL ASH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 14-04488      Carolyn Wade Blackett, Judge**

_____

### No. W2023-01501-CCA-R3-PC
_____

In 2015, a Shelby County jury convicted the Petitioner, Cordell Ash, of especially aggravated robbery, attempt to commit first degree murder, employing a firearm during the commission of a dangerous felony, and of being a convicted felon in possession of a firearm. The trial court imposed an effective sentence of thirty years in the Tennessee Department of Correction. The Petitioner filed a delayed appeal, and this court affirmed the trial court on appeal. *Ash v. State*, No. W2019-01172-CCA-R3-PC, 2020 WL 4919798, at *1 (Tenn. Crim. App. Aug. 20, 2020), *no perm. app. filed*. The Petitioner filed for post-conviction relief, alleging ineffective assistance of counsel. After a hearing, the post-conviction court denied relief. On appeal, the Petitioner maintains that his attorney was ineffective for failing to investigate possible defenses such as a third-party perpetrator. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J. and TOM GREENHOLTZ, J., joined.

Harry E. Sayle, III (on appeal), Assistant Public Defender; Matthew T. Blissitt (at post-conviction hearing), Memphis, Tennessee, for the appellant, Cordell Ash.

Jonathan Skrmetti, Attorney General and Reporter; Katherine Orr, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Carrie Shelton-Bush and Elisabeth Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

A Shelby County jury convicted the Petitioner of especially aggravated robbery, attempt to commit first degree murder, employing a firearm during the commission of a

dangerous felony, and of being a convicted felon in possession of a firearm. The trial court ordered an effective thirty-year sentence in confinement. On a delayed appeal, this court affirmed the trial court's judgments. *Ash*, 2020 WL 4919798, at *1. The Petitioner filed a timely petition seeking post-conviction relief based upon ineffective assistance of counsel. As relevant to this appeal, the Petitioner alleged that his attorney ("Counsel") failed to present a third-party perpetrator defense. After a hearing, the trial court denied relief.

## A. Trial

On direct appeal, this court summarized the facts presented at trial as follows:

On January 7, 2013, Derrick Key and his girlfriend, Patrice Gayden, were watching television in their apartment. Mr. Key decided to go to a nearby gas station to pick up snacks, and, as he was walking down the stairs outside of his apartment, Mr. Key heard two voices below him saying "drop it off, freeze, drop it off, freeze, freeze, freeze." Because Mr. Key knew the phrase "drop it off" meant a robbery was occurring, he quickly ran down the stairs and into the street. Mr. Key was two houses down from his apartment building when the first assailant caught up to him, grabbed the back of his shirt, and hit him in the head with a gun. Mr. Key turned around and saw that both assailants were wearing homemade ski masks.

Mr. Key initially believed he could overpower the assailants because of their small size. However, he reasoned that they would shoot him if he tried to fight back, so he put his hands up and began backing away from the two men. The assailants began hitting Mr. Key repeatedly with their guns, causing him to fall against a nearby gate. One of the assailants was "swinging wildly," and his mask came off of his face and became stuck in his braids. Mr. Key saw the man's face and recognized him as the [Petitioner], whom Mr. Key had known for approximately twenty years from the neighborhood Boys and Girls Club. Specifically, Mr. Key recognized the [Petitioner]'s "distinctive," "smushed in nose, [which] gave him clean away." However, Mr. Key did not know the [Petitioner]'s real name and had always called him "Little Cord" or "Little Foo Foo."

The [Petitioner] and his accomplice asked Mr. Key where his money was, and Mr. Key, who had $23 on him, told them it was in his left pocket. The men then pulled Mr. Key's pants off and ran away. At that point, Mr. Key believed the ordeal was over. However, when the men were several yards away, they turned around and began shooting at Mr. Key, who was still on the ground. After the [Petitioner] and his accomplice finally left, Mr. Key

2

began walking towards his apartment, initially unaware that he had been shot three times in his legs.

While waiting for Mr. Key to return, Ms. Gayden heard a voice outside of her apartment screaming "help me, stop." She looked outside and saw two men beating up another man in the middle of the street. One of the assailants pulled the victim's pants off and shot the victim before running away. Ms. Gayden did not initially realize Mr. Key was the victim of the assault until she saw him walking back toward their apartment. When he reached their apartment building, Mr. Key collapsed in the exterior stairwell, and Ms. Gayden called 911. While waiting for an ambulance to arrive, Mr. Key believed he was going to die and told Ms. Gayden to let his mother and daughter know that he loved them.

The next day at the hospital, Mr. Key told his mother, Cheryl Dockery, and Ms. Gayden that the [Petitioner] was one of his attackers. However, he did not initially disclose this information to the police because he was afraid of retaliation in his neighborhood. Eventually, Mr. Key's mother convinced him to tell the police what he knew, and he told detectives that "Little Cord" was one of his assailants. Several days later, Mr. Key was shown a photo line-up and identified the [Petitioner]'s photograph.

Officer Nathan Newman with the Memphis Police Department responded to a shooting call at Mr. Key's apartment. When he arrived, Officer Newman discovered Mr. Key in the stairwell in front of the apartment building. Mr. Key was suffering from multiple gunshot wounds to his legs and was slow to respond to Officer Newman's questions. Following his interaction with Mr. Key, Officer Newman proceeded to secure the scene and locate evidence. On the sidewalk in front of the apartment building, Officer Newman located two .40 caliber shell casings, a spent projectile, Mr. Key's cell phone, and two bags of cocaine.

. . . .

Juaquatta Harris with the Shelby County Sheriff's Office testified she is responsible for monitoring and disseminating inmate phone calls, and, in February 2013, Ms. Harris received a request from Sergeant Eric Petrowski to monitor the [Petitioner]'s jail calls. The State played several of the [Petitioner]'s jail calls for the jury, and Ms. Harris agreed they did not contain a confession of any kind from the [Petitioner]. However, the [Petitioner] did tell Mr. Key's brother, Lacy, to "keep [the Petitioner's] name out of it."

3

Additionally, in several calls, the [Petitioner] told the person on the other end of the call to "make sure dude doesn't come to court."

On cross-examination, Mr. Key admitted to having a pending drug case and acknowledged he used drugs following the shooting. However, Mr. Key testified he was clean for several years prior to his attack and only began using again after he suffered an emotional breakdown following the shooting. Mr. Key also acknowledged that his trial testimony was the first time he stated under oath that the reason he waited a month to tell the police the [Petitioner]'s name was because he was worried for his safety.

The [Petitioner] called Jimmy Beale, Jr., Ethel Bowen, Nigel Lewis, Sergeant Eric Petrowski, Nadia Toney, and Officer Christopher Beaty as witnesses.

Jimmy Beale, Jr. testified he met the [Petitioner] following the [Petitioner]'s release from federal prison in 2012. They became friends, and the [Petitioner] began living at Mr. Beale's house with Mr. Beale and his father. Mr. Beale runs a well-known recording studio out of his house, and several people in the neighborhood, including Mr. Key, come to the studio to record music. Mr. Beale testified the [Petitioner] could not have shot Mr. Key because the [Petitioner] was at Mr. Beale's recording studio on the day of the shooting with Mr. Beale and several other people. On cross-examination, Mr. Beale admitted he never told police the [Petitioner] was with him on the day of the shooting.

Ethel Bowen, the [Petitioner]'s grandmother, testified she approached Mr. Key prior to one of the [Petitioner]'s court appearances. Ms. Bowen told Mr. Key that the [Petitioner] was not the person who shot him. However, Mr. Key stated he saw the [Petitioner]'s face when the [Petitioner]'s mask came off during the altercation and became caught in the [Petitioner]'s braids. Ms. Bowen tried to explain that this was impossible because the [Petitioner]'s hairline is far back on his head, but Mr. Key was insistent the [Petitioner] was one of his attackers. Mr. Key then told Ms. Bowen that if the [Petitioner] did not tell Mr. Key who shot him, the [Petitioner] was "going to do 60 years." On cross-examination, Ms. Bowen admitted she did not know the [Petitioner]'s whereabouts on the night of the shooting.

Nigel Lewis, an attorney with the Shelby County Public Defender's Office, testified he represented the [Petitioner] for a short time prior to the [Petitioner]'s trial. At one of the [Petitioner]'s hearings, Mr. Lewis spoke

4

with Mr. Key and asked him about the shooting. During their conversation, Mr. Key requested that Mr. Lewis ask the [Petitioner] who committed the crime. However, during the hearing, when Mr. Lewis cross-examined Mr. Key about their prior conversation, Mr. Key denied making such a request. On cross-examination, Mr. Lewis acknowledged that there were two perpetrators and that Mr. Key was never able to identify the second suspect.

Sergeant Eric Petrowski, an investigator with the Memphis Police Department, testified he was the lead investigator in this case. Sergeant Petrowski spoke with Mr. Key in the hospital following the shooting, and Mr. Key stated he was able to recognize one of his attackers because the eye holes in his mask were too big. However, at that time Mr. Key did not provide his attacker's name. Several weeks later, Sergeant Petrowski received a call from Mr. Key, who identified "Little Cord" as one of the perpetrators. Using this information, Sergeant Petrowski developed the [Petitioner] as a suspect. Sergeant Petrowski acknowledged he did not test the evidence found at the crime scene for fingerprints and did not ask Mr. Key about the cocaine found at the crime scene. On cross-examination, Sergeant Petrowski agreed the [Petitioner] never stated he was at the recording studio with Mr. Beale at the time of the shooting and did not provide an alibi of any kind.

Nadia Toney, the [Petitioner]'s aunt, testified she went to school with Mr. Key's mother and had known Mr. Key for several years. Prior to one of the [Petitioner]'s court appearances, Ms. Toney and her mother, Ms. Bowen, approached Mr. Key, who described the details of the robbery and shooting. After Ms. Bowen walked away, Mr. Key told Ms. Toney that the [Petitioner] would go to jail if he did not tell Mr. Key who shot him. Additionally, Mr. Key told Ms. Toney that he had "some guys" who were waiting on his word to "do something" to the [Petitioner]. On cross-examination, Ms. Toney admitted she never reported Mr. Key's threat to the police.

*Id.* at *1-3.

As part of the record, the parties have included the trial transcript, and we summarize portions that are relevant to the Petitioner's post-conviction claim. At trial, Counsel cross-examined Mr. Key about a conversation he had with the Petitioner's mother. Mr. Key acknowledged that the Petitioner's mother had approached him but denied telling her that he "didn't know who shot [him] but her son was going to do 60 years if he didn't tell you who he thought did it." Mr. Key maintained that, when the Petitioner's mother approached him, he listened and did not respond. Mr. Key also denied telling Mr. Lewis, the

Petitioner's former attorney, that Mr. Key did not know who shot him. He explained that Mr. Lewis approached him outside of the courtroom with names of other possible suspects.

Sergeant Petrowski testified that, at the hospital, he asked Mr. Key if Keith Bate was the shooter and Mr. Key responded in the negative. On cross-examination, the State asked Sergeant Petrowski why he had inquired about Mr. Bate as a potential shooter. Sergeant Petrowski explained that Mr. Key was a victim in a pending criminal case where Mr. Bate was the shooter. Sergeant Petrowski admitted that, when he asked the question, he knew Mr. Bate was in jail.

## B. Post-Conviction Hearing

At the beginning of the hearing, the State briefly summarized events leading up to the hearing stating, "[Counsel] came in last week and said he was asserting his Fifth Amendment Rights and then [the trial court] declared [Counsel] unavailable for purposes of this hearing." The only witness presented at the hearing was the Petitioner.

The Petitioner testified that he hired Counsel a week or two before trial. During this time, Counsel never conveyed to the Petitioner any offers for a settlement from the State. The Petitioner denied that Counsel ever discussed with him the potential outcomes of proceeding to trial or of mandatory minimums for service of a sentence associated with the charges. After he was convicted, Counsel failed to timely file a notice of appeal, so this Court granted a delayed appeal. The Petitioner recalled that "they told [him] [Counsel's] license had been suspended."

The Petitioner testified that Counsel did not investigate or prepare a defense strategy in the two weeks he had to prepare for trial. The Petitioner stated that Counsel failed to get the hospital records to determine whether Mr. Key actually sustained injuries to his head as Mr. Key claimed. The Petitioner also asserted that Counsel did not raise the issue of a potential suspect known as "Debo." He confirmed that Counsel "brought up something about Keith Bate" but not "Debo." When post-conviction counsel asked the Petitioner if Counsel "was ever aware" of Debo as a potential suspect, the Petitioner responded, "No. He never -- he never brought up Debo. He brought up something about Keith Bate, but he ain't never get into detail about, you know what I'm saying, Jerry Bullock. He would talk about Keith Bate." This is the only mention of Jerry Bullock at the post-conviction hearing.

On cross-examination, the Petitioner agreed that he was initially represented by the public defender's office and that the assistant public defender had notified him of the State's offer of eighteen years. The Petitioner declined the offer and chose to proceed to trial. The Petitioner agreed that he and Counsel discussed "Debo," who was another person listed on a "Crime Stopper Tip" after the shooting. He recalled that, at trial, Counsel

6

elicited information about possible other parties involved in the crime and those other parties were "Debo" and Keith Bate. The Petitioner further agreed that Counsel presented Mr. Beale, who testified that the Petitioner was with him the day of the shooting, and his grandmother, who offered testimony indicating someone else shot Mr. Key. He recalled that Counsel also called the Petitioner's first attorney, Nigel Lewis, who worked at the Public Defender's office. Mr. Lewis testified about statements Mr. Key made outside the courtroom indicating someone else was involved.

After the hearing, the post-conviction court issued a written order denying relief. In relevant part, the order stated:

> Petitioner alleges that [Counsel] did not present a third-party guilty defense. However, very little information has been testified to about the identities regarding Debo, Keith Bate, or Jerry Bullock, the only other potential suspects, according to Petitioner. However, Petitioner did testify that [Counsel] brought up the names Debo and Keith Bate at trial, with nothing else stated on the matter. The State also introduced evidence at the hearing that [Counsel] called Petitioner's former defense attorney, Mr. Nigel Lewis, to testify on Petitioner's behalf. The State contends that Mr. Lewis' testimony indicated that the victim had informed him that a third-party was involved in the incident. Because of the evidence to the contrary, Petitioner has failed to rebut the "strong presumption" that [Counsel] gave Petitioner "reasonable professional assistance." Petitioner fails on this issue.

(citations omitted). It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner asserts that he received the ineffective assistance of counsel at trial. He maintains that Counsel failed to present a third-party defense, which prejudiced his defense. The State responds that the Petitioner has failed to show that Counsel was deficient for not presenting a third-party defense or that he was prejudiced. We agree with the State.

A criminal defendant's right to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffective assistance of counsel:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical

8

choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The evidence does not preponderate against the post-conviction court's findings that Counsel brought up both Debo and Keith Bate at trial as potential third-party perpetrators of the crime and that Counsel called Mr. Lewis to provide testimony related to a third-party defense. Counsel presented Mr. Beale, who testified that the Petitioner was with him on the day of the shooting and, therefore, could not have been the shooter. More directly, Counsel called Mr. Lewis, the Petitioner's former attorney, who testified about a conversation with Mr. Key wherein Mr. Key indicated that there was another shooter. In support of Mr. Lewis's testimony, Counsel presented the testimony of the Petitioner's grandmother and aunt who confirmed that they had conversations with Mr. Key in which he indicated that another person was the shooter. We also note that, on cross-examination, Counsel asked Sergeant Petrowski if he had asked Mr. Key about Keith Bate being the shooter. Sergeant Petrowski confirmed that he asked Mr. Key about Mr. Bate and that Mr. Key had responded to the inquiry in the negative. Sergeant Petrowski testified that Mr. Bate was in jail at the time of the shooting and, therefore, could not have been the shooter.

Further, the Petitioner failed to present any testimony from, or evidence about, Debo, Jerry Bullock, or Keith Bate beyond his mere mention of their names. When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner should present these witnesses at the evidentiary hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Accordingly, we conclude that the Petitioner failed to prove, by clear and convincing evidence, his allegation that Counsel failed to investigate a third-party perpetrator defense. Moreover, he has not demonstrated with clear and convincing evidence that a third-party defense centered on these three men would have affected the outcome of his trial. The Petitioner is not entitled to relief.

### III. Conclusion

Based upon the foregoing, we affirm the post-conviction court's judgment.


_____
ROBERT W. WEDEMEYER, JUDGE